Charles Lew (SBN 227495)
Charles@thelewfirm.com
Isaiah Artest (SBN 320326)
Isaiah@thelewfirm.com
THE LEW FIRM, APC
9440 Santa Monica Blvd., Suite 301
Beverly Hills, California 90210
Telephone: (310) 279-5145
Facsimile:  (310) 300-1819

Damion D. D. Robinson, SBN 262573
David Markevitch, SBN 256163
Jimmie Davis Parker SBN 252023
ROBINSON MARKEVITCH & PARKER LLP
8430 Santa Monica Blvd., Suite 200
West Hollywood, California 90069
Tel.     (213) 757-7778
Email:  dr@robinsonmarkevitch.com
            dm@robinsonmarkevitch.com
            jdp@robinsonmarkevitch.com

Attorneys for Class Plaintiffs and all others similarly situated

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE 1, an individual; JANE DOE 2, an individual; JANE DOE 3, an individual; JANE DOE 4, an individual JANE DOE 5, an individual, JANE DOE 6, an individual; JANE DOE 7, an individual, and JANE DOE 8, an individual, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>JAIME S. SCHWARTZ, MD, an individual; JAMIE S. SCHWARTZ, MD PC, a California professional corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF FOR:**<br><br>**1. VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMAITON ACT;**<br><br>**2. NEGLIGENCE;**<br><br>**3. VIOLATION OF THE UNFAIR COMPETITION LAW [Cal. Bus. & Prof. Code § 17200];**<br><br>**4. INVASION OF PRIVACY; and**<br><br>**5. VIOLATION OF CALIFORNIA CIVIL CODE § 1798.80, *et seq.*;**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiffs JANE DOE 1, an individual, JANE DOE 2, an individual, JANE DOE 3, an individual, JANE DOE 4, an individual, JANE DOE 5, an individual, JANE DOE 6, an individual, JANE DOE 7, an individual, JANE DOE 8, an individual (collectively, "Class Plaintiffs" or "Plaintiffs"), on behalf of themselves and all others similarly situated ("Class Members"), allege for their complaint against Defendants JAIME S. SCHWARTZ, MD, and JAIME S. SCHWARTZ, MD PC, a California professional corporation (collectively, "Dr. Schwartz"), and DOES 1 through 10, inclusive (collectively with Dr. Schwartz, "Defendants") as follows. Allegations herein are made on personal knowledge as to Class Plaintiffs and information and belief as to all other matters.

## **INTRODUCTION**

1.    Dr. Schwartz is a prominent plastic surgeon with offices in Beverly Hills and Dubai. He has appeared on television networks Bravo and E! and was a featured doctor on the hit shows "Botched" and "The Doctors."  On his website, Dr. Schwartz proclaims that he "respect[s]" and is "committed to protecting" patient privacy.

2.    Despite charging clients thousands of dollars and having access to their deeply private medical information, Dr. Schwartz disregarded basic security measures necessary to protect that information from malicious cyberattacks. Dr. Schwartz and others in the medical field – and in the plastic surgery field specifically – have been warned for years by government agencies and professional organizations that they are targets for hackers who seek sensitive patient data for ransom and extortion.

3.    Dr. Schwartz disregarded these warnings and failed to take patient security seriously. As a result of his negligence, he allowed his network to be compromised **twice** in less than a year. On information and belief, the malicious actors gained access to Dr. Schwartz entire network and all or substantially all patient data.

4.    The hackers stole private personal and medical data from thousands of patients to use in an effort to extort Dr. Schwartz. During the first hack in or about September and October of 2023, the malicious actors downloaded 1.1 terabytes of

patient data, reflecting almost 250,000 unique files. The private data included, among other things, nude photographs and video of patients taken during the course of treatment, including images with both their faces and private parts visible, and images taken during surgery reflecting their surgical procedures.

5.     Not only did Dr. Schwartz fail to notify his patients or law enforcement as required, but he actively hid the first hack from his patients. He also failed to take reasonable measures to secure his network, even after learning of the first hack.

6.     Approximately six months later, in March of 2024, Dr. Schwartz's system was hacked a second time. On information and belief, the hackers again gained access to his entire system and all or substantially all patient data.

7.     Once again, however, Dr. Schwartz attempted to sweep the second hack under the rug. He failed to notify his patients as required by federal and state law. He waited to do so until after the hackers posted a ***public website*** (the "Hacker Website"), announcing the hack and leaking patients' names, contact information, and nude photographs, and began contacting his patients directly.  Despite knowing that his patients' most private medical data was in the hands of malicious actors, Dr. Schwartz waited almost 10 months to notify them. Finally, after their nude photos and home addresses began being posted online – accessible to anyone with an internet connection –Dr. Schwartz issue a cursory, vague, and misleading data breach notice.

8.     To date, the hackers have posted approximately 30 patient files, complete with names, dates of birth, phone numbers, home addresses, and nude photos – including photos of unconscious patients during surgery. They have warned that they will continue releasing patient files, in alphabetical order, until Dr. Schwartz's contacts them to address the matter.

9.     In addition to the usual array of plastic surgery offerings, such as liposuction and breast augmentation, Dr. Schwartz specializes in treatment of lipedema. Lipedema is a painful and potentially disfiguring condition primarily affecting women. It involves the abnormal buildup of fat in the lower body,

specifically the buttocks, thighs, and calves.

10.    Class Plaintiffs are patients of Dr. Schwartz and victims of the cyberattacks.  Each of them sought medically necessary treatment from Dr. Schwartz to address their lipedema on the understanding that their treatment and medical records would be kept strictly confidential. As a result of this treatment, Dr. Schwartz and his staff obtained extensive medical information about Class Plaintiffs and other patients, including the types of information, photographs, and videos outlined above. With respect to Class Plaintiffs and many others, these photographs and videos include detailed, nude and semi-nude images of their pelvic areas, breasts, thighs, and buttocks, including images and video taken during surgery.

11.    On information and belief, all this information was exfiltrated from Dr. Schwartz's network during the recent cyberattack. Class Plaintiffs have been threatened with the imminent release of this deeply private information. It is only a matter of time before the hackers reach their names in the alphabet and release their names, home addresses, medical information, and private images.

12.    Plaintiffs bring this action for injunctive relief to rectify Dr. Schwartz's negligent cybersecurity practices and to require him to destroy or secure any private personal and medical information in his possession. They also seek statutory damages and damages for the severe emotional toll that having their private medical information compromised has taken on them.

## PARTIES

### *Class Plaintiffs*

13.    Jane Doe 1 is an individual and citizen of the State of Colorado.

14.    Jane Doe 2 is an individual and citizen of the State of Vermont.

15.    Jane Doe 3 is an individual and citizen of the Commonwealth of Pennsylvania.

16.    Jane Doe 4 is an individual and citizen of the State of California.

17.    Jane Doe 5 is an individual and citizen of the State of New York.

18.    Jane Doe 6 is an individual and citizen of the State of California.

19.    Jane Doe 7 is an individual and citizen of the State of Florida.

20.    Jane Doe 8 is an individual and citizen of the State of Oregon.

21.    Plaintiffs sue under these pseudonyms pursuant to *Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000).  Plaintiffs will promptly file a Motion with this Court to allow them to so proceed to protect their identities and the privacy of their medical information.

### *Defendants*

22.    Defendant Jaime M. Schwartz, MD is an individual and, on information and belief, a resident of Los Angeles County, California. Dr. Schwartz owns and operates Jaime M. Schwartz, MD PC.

23.    Defendant Jaime M. Schwartz, MD PC is a California professional corporation with its principal place of business in Beverly Hills, California. Jaime M. Schwartz, MD PC operates two plastic surgery practices in Beverly Hills and Dubai.

24.    Class Plaintiffs are currently unaware of the true names and capacities of Defendants Does 1 through 10 ("Doe Defendants"), inclusive, and so name them under these fictitious names. Class Plaintiffs are informed and believe that the Doe Defendants are in some manner legally responsible for the acts, omissions, and damages alleged herein.  On information and belief, the Doe Defendants include the individuals and entities who were in part responsible for maintaining the security of Dr. Schwartz's computer system and network, and the individuals and entities responsible for allowing the hack to take place.  On information and belief, the Doe Defendants are principals, agents, partners, joint venturers, and alter egos of the other Defendants, acted in concert with the other defendants, aided and abetted the other Defendants, and conspired with the other Defendants in connection with the conduct alleged herein. Class Plaintiffs will seek leave to amend this Complaint to identify the true names and capacities of the Doe Defendants when the same become known.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332. The amount in controversy in this action exceeds $5,000,000, exclusive of interests and costs. There are more than 100 members in the proposed class.  Plaintiffs estimate that the data breaches affected hundreds, if not thousands, of Dr. Schwartz's patients. At least one member of the class is a citizen of a state different from Defendants, including Jane Does 1, 2, 3, 5, 7 and 8.

26.    The Court has personal jurisdiction over Defendants who maintain their residence and principal place of business in this District, and who regularly transact business within the State of California.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Class Plaintiffs' claims occurred in and emanated from this District, namely from Dr. Schwartz's offices in Beverly Hills, California.

28.    California has a significant interest in regulating businesses operating within its jurisdiction, including the protection of consumers' rights and personal data.

29.    Dr. Schwartz's operations are headquartered in Beverly Hills, California, from where he oversees all corporate policies, including data security, from within the state.  Based on available information, decisions regarding Defendants' response to the data breach originated from California.

30.    Because Defendants' actions and failures to act occurred in California, California's laws are appropriately applied.  Under California's choice of law principles, California law governs the nationwide claims of Plaintiffs and the Class.

31.    Additionally, California's Unfair Competition Law, CMIA, and Consumer Privacy Act apply to non-resident Plaintiffs due to Defendants' business operations in California and the fact that the acts and omissions from which liability arose occurred in California.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Dr. Schwartz's Medical Practice

32.     Dr. Schwartz owns and operates a plastic surgery practice in Beverly Hills, California. He is a board-certified plastic surgeon and a member of the American Society of Plastic Surgeons ("ASPS").  According to his marketing materials, he is "an internationally recognized expert in plastic surgery, specializing advanced surgical techniques" and "nationally renowned" for plastic surgery.

33.     Dr. Schwartz offers a wide array of plastic surgeries, primarily catering to women. Among other things, he is widely known for his accomplishments in the field of breast augmentation and reconstruction, offering a host of related services to patients. He also offers a series of other surgical options focusing on private areas of the body, such as liposuction, butt lifts and implants, cellulite reduction, and vaginal rejuvenation.

34.     In addition to a wide array of cosmetic surgeries, Dr. Schwartz also specializes in medically necessary treatment for lipedema. Lipedema treatment involves highly invasive surgery to remove excess fat tissue from the buttocks, thighs, and calves while preserving delicate lymph nodes and blood vessels.

### Dr. Schwartz Maintains Extensive, Confidential Medical Information

35.     By virtue of his treatment of Class Plaintiffs and other patients, Dr. Schwartz generates and maintains a large volume of confidential and private information about his patients ("Personal and Medical Information").

36.     This information includes, without limitation, patients' names, telephone numbers, and home addresses, their ages and dates of birth, their physical characteristics, including height, weight, eye color, and hair color, copies of their driver's licenses and insurance cards, insurance information, *i.e.*, their insurance carriers and types of coverage, payment information, such as credit card information, and medical information, including medical history, conditions, diagnoses, and treatment.

37.     Dr. Schwartz also obtains from patients, generates, and maintains large numbers of photographs and videos depicting patients and their conditions. During the consultation process, Dr. Schwartz regularly asks that patients send in photos depicting their conditions. These photos are frequently nude or semi-nude photos. In addition, Dr. Schwartz takes extensive photos and videos of patients during the course of treatment. He has an entire room at his surgery center dedicated to taking detailed photos completely documenting patients' physical condition before and after surgery. These photos are also frequently nude or semi-nude.  Finally, Dr. Schwartz and his staff film and photograph unconscious patients during surgery, ostensibly to allow Dr. Schwartz to document and review the surgery after it is completed. Class Plaintiffs' and other patients' faces are clearly visible in these photographs and video.

38.     The photographs and videos are directly connected to Class Plaintiffs' and other patients' names and identifying information on Dr. Schwartz's network.

### Defendants Were Obligated to Protect Personal Medical Information

39.     Defendants are subject to the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for the Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226 ("HIPAA"). Among other things, Defendants are and were at all relevant times subject to the *Standards for Privacy of Individually Identifiable Health Information* (the "Privacy Rule") and the *Security Standards for the Protection of Electronic Protected Health Information* (the "Security Rule"), contained in 45 C.F.R. Parts 160 and 164, Subparts A and C.  The Privacy Rule and the Security Rule create nationwide standards for the protection of patient health information.

40.     HIPAA required Defendants to "comply with the applicable standards, implementation specifications, and requirements" established under HIPAA "with respect to "electronic protected health information." 45 C.F.R. § 164.302.

41.     The Security Rule required Defendants to do all of the following:

a.     Ensure the confidentiality, integrity, and availability of all

electronic protected health information the covered entity or
business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the
security or integrity of such information;

    c.    Protect against any reasonably anticipated uses or disclosures of
such information that are not permitted; and

    d.    Ensure compliance by their workforce.

42.    HIPAA further required Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection," 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

43.    The California Confidentiality of Medical Information Act, Civil Code § 56, *et seq.* (the "CMIA"), also prohibits the disclosure of patient medical information without authorization. *See* Civ. Code § 56.10. "Medical information" is defined to include (a) individually identifiable information relating to a person's medical history, condition, or treatment, (b) in the possession of or derived from a provider of health care, (c) pertaining to a patient.

44.    As a "provider of health care" as defined in the CMIA, Civ. Code § 56.05(f), Defendants were required to maintain medical information "in a manner that preserves the confidentiality of the information contained therein."

45.    Health and Safety Code § 1280.15 and 1280.18 require healthcare facilities to safeguard and prevent the unauthorized access of patient medical information.

46.    Pursuant to Civil Code § 1798.81.5(b), any "business that owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the

information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

47.    Further, any business that discloses personal information "pursuant to a contract with a nonaffiliated third party shall require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to prevent the personal information from unauthorized access." *Id.*, subd. (c).

48.    In addition to the requirements of various statutes and regulations applicable to medical providers and holders of confidential consumer information, Defendants had a common law duty to Class Plaintiffs and other patients to use reasonable care in maintaining, securing, preserving, deleting, and protecting their Personal and Medical Information against the prevalent and well-known threat that it would be compromised, exfiltrated, and misused by unauthorized persons.

49.    This duty included, without limitation, a duty to use reasonable security measures consistent with industry standards and requirements, and to ensure that computer systems, networks, and protocols adequately protected the Personal and Medical Information.

***Dr. Schwartz Had Ample Notice of the Risk of Cyberattacks and Industry Standards for Preventing Data Breaches.***

50.    Defendants were on notice of the risk of hacking in the medical field for years, and in the plastic surgery field in particular. They were also well aware of the need to use best practices and take reasonable steps to protect sensitive patient information. Defendants brazenly disregarded these standard practices, resulting in the two data breaches alleged herein.

51.    For years, the medical community has been the target of hacking. The risk to patient data security posed by this hacking threat has been widely reported and is well known within the medical field.

52.    In 2014, following the hack of Community Health Systems Inc., the FBI

warned the medical profession that healthcare firms are targets for hackers. It specifically warned of the risk to patient data: "The FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)." It is well known that patient medical data is highly valuable to hackers for purposes of extortion and ransom, making it a target for data breaches.

53.    In 2019, the American Medical Association ("AMA") published a report entitled *Patient Safety: The Importance of Cybersecurity in Healthcare*, warning that cybersecurity "is not just a technical issue, it's a patient safety issue."  The report noted that 83% of physicians had experienced some form of cyberattack.  Among other risks, the AMA has warned physicians about the risks of ransomware attacks.

54.    Since at least 2020, the American Medical Association ("AMA") has maintained a dedicated cybersecurity website, warning doctors and medical groups of the risks of hacking, including the risk to sensitive patient data, and providing industry standard guidelines for information security.

55.    Similarly, since at least 2022, the U.S. Department of Health and Human Services ("DHHS") has maintained its own website on cybersecurity in the healthcare field, again warning of the risks of hacking and unauthorized access to private data.

56.    Over the past several years, hackers have begun to focus their efforts on hacking plastic surgery practices due to the sensitive information retained by plastic surgeons. This information is particularly valuable for purposes of sale on the dark web to facilitate identity theft and for purposes of ransom/extortion against physicians and patients. Frequently these hacks have involved a hacker group gaining access to a surgeon's computer system and downloading (or "exfiltrating") large amounts of sensitive patient data, including sensitive photographs. Hackers then use this data to attempt to extort the physician or patients directly.

57.    According to a report from DataBreaches.net, between 2017 and 2023, there were at least a dozen publicly reported successful hacks of plastic surgery

practices.  Many of these hacks resulted in online data leaks and attempted extortion of surgeons or patients. Several high-profile plastic surgery practices were subject to hacks, such as the 2020 hack of the prominent Hospital Group, and the hacks were widely reported in the media.

58.    The American Society of Plastic Surgeons ("ASPS"), of which Dr. Schwartz is a prominent member, has repeatedly warned its membership of the risks of hacking and published guidelines for cybersecurity.

59.     Among other things, the ASPS publishes on its website a 2022 report co-authored by the DHHS and the Healthcare & Public Health Sector Coordinating Councils entitled *Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients* ("DHHS Report"). This report warns of the serious risks of hacking on medical information systems and urges healthcare providers to adopt best practices to protect their systems. It notes, "Given the increasingly sophisticated and widespread nature of cyber-attacks, the health care industry must make cybersecurity a priority and make the investments needed to protect its patients."

60.    In June of 2023, the hacking syndicate BlackCat (AlphV), publicly posted that they had hacked the well-known Beverly Hills Plastic Surgery, and "ha[d] lots of PII [patient identifying information] and PHI [protected health information], ***including a lot of pictures of patients that they would not want out there***."  This hack was also publicly reported.

61.    In the same timeframe, another well-known plastic surgeon in the Los Angeles area was also hacked.  When the surgeon refused to pay a $2.5 million ransom, the hackers began leaking nude photos of patients along with their personal identifying information, and threatened to leak more until the ransom was paid.  The hackers also directly contacted patients and demanded $800,000 to remove their photos from a hacker website. This hack was also publicly reported.

62.    On July 6, 2023, the ASPS sent an alert to its membership, entitled *Notice of ransomware scam targeting plastic surgeons*, about the risk of ransomware

CLASS ACTION COMPLAINT

"phishing" attacks. The alert warned that hackers had targeted plastic surgeons, and having gained access to the surgeons' systems, "***comb[] the surgeon's network for patient data and photos***. This then leads to an extortion attempt to release that data."

63. The hacking threat against plastic surgeons has become so significant that in October of 2023, the FBI issued a Public Service Announcement, entitled *Cybercriminals are Targeting Plastic Surgery Offices and Patients*, Alert Number: I-101723-PSA, warning surgeons of the increasing risk of hacking. The Public Service Announcement again warned that cybercriminals were targeting plastic surgery offices "*to harvest personally identifiable information and sensitive medical records, to include sensitive photographs* in some instances."

64. The announcement explained the process of these hacks, including:

a. "Data Harvesting," including "harvest[ing] electronically protected health information (ePHI), which includes sensitive information and photographs";

b. "Data Enhancement," using publicly available information, such as social media, to gather additional information about patients to use in extortion; and

c. "Extortion," demanding money from surgeons and patients to prevent disclosure of the sensitive data.

65. The announcement noted that, "[t]o exert pressure on victims for extortion payments, cybercriminals share the sensitive ePHI to victims' friends, family, or colleagues, and create public-facing websites with the data. Cybercriminals tell victims they will remove and stop sharing their ePHI only if an extortion payment is made."

66. On October 19, 2023, the ASPS reposted the FBI Public Service Announcement on its website.

***October 2023—The First Hack and Dr. Schwartz's Failed Response***

67. On information and belief, also in October 2023, the hacker group Hunter International posted on the dark web that it had successfully infiltrated Dr. Schwartz's network (the "First Hack").

68.     According to this dark web posting, the hackers had exfiltrated 1.1 terabytes of data from Dr. Schwartz, consisting of 248,245 files. Based on publicly available data, the dark web posting included four patient photos, including one nude photo with the patient's face visible. The hackers claimed that they had hacked Dr. Schwartz's system in September of 2023.

69.     On November 11, 2023, the hacker group updated their dark web posting by listing patient data and included the following note to Dr. Schwartz:

> Seems like you don't want to protect your data at all. More than 30 days had passed already since your network has been breached. You have been provided with everything you have asked about: sample of files, decryption tool demonstration, filetree, personal details. But you keep begging for proofs. This is not the way we going to make business with you. Maybe you will do us a favor and transfer half of the money to prove that you can pay for your data? That would be fair, we guess. **Nevertheless, we will start deploying a little piece of your data everyweek, until all of your data will be shared this way. Starting today. You still have an option to pay for your data, until sharing is finished.**

70.     On December 1, 2023, the hacker group reposted its dark web listing, this time adding nude photos of patients, and advising, "If you find your private data here just email us and we will let you know how to proceed further with actions against this DOCTOR!"

71.     Dr. Schwartz did not notify patients of the September-October 2023 attack. He unequivocally refused to pay ransom. On information and belief, he also failed to provide required notices to the California Attorney General or the DHHS.

72.     Instead, when a small number of patients contacted Dr. Schwartz after the First Hack was reported online, he and his staff attempted to minimize the data breach by falsely claiming that it affected only a small number of patients and that other patients' records were secure. Dr. Schwartz and his colleagues continued to assure patients (falsely) that their data was not compromised.

***March 2024—The Second Hack and Dr. Schwartz Untimely Disclosure***

73.     Despite hackers compromising his system and attempting to extort him,

Dr. Schwartz still failed to implement reasonable security protocols.

74.     In early 2024, Dr. Schwartz's system was hacked a second time (the "Second Hack"; collectively with the First Hack, "Data Breaches"). Dr. Schwartz claims that he first learned of the hack in late June 2024.  It is unclear how long his system had been compromised before he purportedly "discovered" the Second Hack. According to the Hacker Site – a public, "clear web" site[1] posted by the hackers – they successfully compromised Dr. Schwartz's system in March of 2024.

75.     The hackers again obtained large amounts of sensitive patient data, including the data of the Class Plaintiffs.  On information and belief, the entirety of Dr. Schwartz's patient data was compromised, and the hackers exfiltrated all or substantially all Personal and Medical Information of Dr. Schwartz's patients.

76.     This data included patient's full names, identifying information, home addresses, dates of birth, and physical data, as well as insurance information and payment information regarding procedures not covered by insurance. According to Dr. Schwartz's belated notice of the data breach, the affected data also included medical information and prescription medications. Most disturbingly, it included nude and partially clothed photographs and videos of Dr. Schwartz's patients, including photographs of patients during surgery.

77.      On or about December 16, 2024, the hackers posted the Hacker Website, announcing the hack and disclosing that Dr. Schwartz had refused to address the incident for months. The website includes extremely sensitive data, including personally identifying information of patients and nude photos taken during surgery. The hackers also threaten on the website to continue releasing information and photos of additional patients if Dr. Schwartz does not contact them.

78.     To date, the hackers have published sensitive personal information of 30 patients, organized by name and data of birth. The files include headshots of the

---

[1] The "clear web" or "surface web" refers to the publicly accessible internet, indexed by standard search engines, such as Google. It is distinguished from the "dark web" which must be accessed through specialized software.

victims, full, unredacted copies of their drivers' licenses and insurance cards, and

nude and partially clothed photos, depicting their medical conditions and surgeries.

Some of the photos appear to have been taken while patients were unconscious and

undergoing surgery, reflecting surgical incisions and sutures.

79.    Once again, on information and belief, Dr. Schwartz failed to take

reasonable steps to secure his system, and he failed to respond in an appropriate

manner to the hack as required by law.

80.    In January of 2025, Dr. Schwartz sent certain patients, including Class

Plaintiffs, a Notice of Data Security Incident (the "Data Breach Notice").  In it, he

notified patients as follows:

> Our office discovered on June 27, 2024, that an unauthorized third party
> utilized a third-party vendor's credentials to access the practice's medical
> billing and practice management system. Upon discovering the incident,
> we engaged a specialized third-party forensic incident response firm to
> conduct a forensic investigation and determine the extent of the
> compromise. The investigation determined that data was acquired without
> authorization. After electronic discovery, which concluded on January 2,
> 2025, it was determined that some of your personal information was
> present in the impacted data set.  We then took steps to notify you of the
> incident as quickly as possible.

81.    Class Plaintiffs are informed and believe that Dr. Schwartz has not

notified the California Attorney General or the DHHS as required by law.

82.    Because Dr. Schwartz has not yet made a full or transparent disclosure of

the hack, significant questions remain about the nature and scope of the hack and the

types and amounts of data that have been compromised.  Plaintiffs are informed and

believe, however, that the hackers gained access to, viewed, and copied substantially

all of the patient data on Dr. Schwartz's system.

### *Dr. Schwartz Negligently Maintained His Systems*

83.    The First Hack and the Second Hack were caused by Dr. Schwartz's

negligent maintenance of his network and computer systems, which allowed malicious

actors to gain access to those systems and to access and exfiltrate unencrypted

Personal and Medical Information.

**Prevailing Standards for Protection of Sensitive Patient Data**

84.    Governmental agencies, industry organizations, and technology companies have established a set of basic cybersecurity standards to minimize the risk of hacking and access to unencrypted patient or customer data.

85.    For example, the DHHS Report provides the following basic cybersecurity protocols for the medical industry, among others:

a.    securing email accounts;

b.    installing and maintaining spam/anti-virus software solutions;

c.    using multi-factor authentication (MFA);

d.    correctly configuring security settings;

e.    training employees on cybersecurity;

f.    limiting user access to administrative accounts so that administrative accounts are used only for essential purposes;

g.    utilizing encryption on user devices;

h.    enabling network firewalls;

i.    utilizing MFA for access to connected devices;

j.    maintaining unique user accounts and tailoring each user's access to essential functionality and data;

k.    using encrypted storage media and devices for sensitive information;

l.    controlling access to sensitive and highly sensitive data within the network, including placing more sensitive data in restricted zones that are more difficult to access;

m.    limiting third-party vendor access to sensitive data;

n.    establishing and enforcing network "traffic" restrictions;

o.    monitoring network activity and maintaining an audit trial, and

p.    monitoring and patching vulnerabilities and keeping software

- 17 -

1  updated.

2        86.    The FBI recommends the following security measures, among others:

3             a.    Implement an awareness and training program. Because end users

4  are targets, employees and individuals should be aware of the threat of ransomware

5  and how it is delivered.

6             b.    Enable strong spam filters to prevent phishing emails from

7  reaching the end users and authenticate inbound email using technologies like Sender

8  Policy Framework (SPF), Domain Message Authentication Reporting and

9  Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email

10  spoofing.

11             c.    Scan all incoming and outgoing emails to detect threats and filter

12  executable files from reaching end users.

13             d.    Configure firewalls to block access to known malicious IP

14  addresses.

15             e.    Patch operating systems, software, and firmware on devices.

16  Consider using a centralized patch management system.

17             f.    Set anti-virus and anti-malware programs to conduct regular scans

18  automatically.

19             g.    Manage the use of privileged accounts based on the principle of

20  least privilege: no users should be assigned administrative access unless absolutely

21  needed; and those with a need for administrator accounts should only use them when

22  necessary.

23             h.    Configure access controls-including file, directory, and network

24  share permissions-with least privilege in mind. If a user only needs to read specific

25  files, the user should not have write access to those files, directories, or shares.

26             i.    Disable macro scripts from office files transmitted via email.

27  Consider using Office Viewer software to open Microsoft Office files transmitted via

28  email instead of full office suite applications.

CLASS ACTION COMPLAINT

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m.  Execute operating system environments or specific programs in a virtualized environment.

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

87.  The United States Cybersecurity & Infrastructure Security Agency recommends the following protective measures, among others:

a.  Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks....

b.  Use caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)....

c.  Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d.      Keep your personal information safe. Check a website's security to ensure the information you submit is encrypted before you provide it....

e.      Verify email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f.      Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques….

g.      Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic...

88.      The Microsoft Threat Protection Intelligence Team, an industry leader in cybersecurity, recommends the following practices:

a.      Secure internet-facing assets;

b.      Apply latest security updates;

c.      Use threat and vulnerability management;

d.      Perform regular audits;

e.      Remove privileged credentials

f.      Thoroughly investigate and remediate alerts;

g.      Prioritize and treat commodity malware infections as potential full compromise;

h.      Include IT Pros in security discussions

i.      Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

j.      Build credential hygiene

k.      Use [multifactor authentication] or [network level authentication]

1  and use strong, randomized, just-in-time local admin passwords;

2          l.    Apply principle of least-privilege;

3          m.    Monitor for adversarial activities;

4          n.    Hunt for brute force attempts;

5          o.    Monitor for cleanup of Event Logs;

6          p.    Analyze logon events;

7          q.    Harden infrastructure;

8          r.    Use Windows Defender Firewall;

9          s.    Enable tamper protection;

10          t.    Enable cloud-delivered protection;

11          u.    Turn on attack surface reduction rules and [Antimalware Scan

12  Interface] for Office [Visual Basic for Applications].

13  **Defendants' Failure to Implement Reasonable Protections**

14      89.    Defendants failed to implement and maintain reasonably adequate

15  cybersecurity protocols, which failure allowed and exacerbated the Data Breaches. On

16  information and belief, their negligent failures to protect patient data included, without

17  limitation, the following.

18      90.    Defendants failed to store highly sensitive patient data in appropriately

19  secured parts of their network consistent with the sensitivity of the data and, on

20  information and belief, stored patient data in an unencrypted format or with

21  inadequate encryption in place. In addition, Defendants allowed sensitive patient data,

22  including photographs, videos, and medical information, to be stored on unused and

23  obsolete systems, and outside of a secured network, and allowed those systems to

24  remain accessible after they were no longer in use.

25      91.    Defendants failed to adequately secure patient files to prevent them from

26  being accessible over the internet.

27      92.    Defendants failed to properly manage access to their system, including

28  failing to implement appropriate multi-factor authentication for staff and vendors,

gave staff and vendors access to information that was not necessary to perform their functions, failed to enforce appropriate credential hygiene – *e.g.*, regular password changes –, and failed to ensure that users had appropriate, strong passwords. Defendants also failed to adequately restrict user access to network resources and data for which those users had no legitimate need and stored sensitive patient data that allowed access by user accounts without a legitimate need for access.

93.    Defendants failed to secure network-connected devices, including connected medical devices, in a manner reasonably designed to prevent intrusion.

94.    Defendants failed to adequately train their staff to avoid "phishing" and other social-engineering attacks, failed to use due care in selecting and supervising third-party vendors, and failed to reasonably ensure that vendors with access to sensitive patient data were appropriately retained and maintained secure access credentials.

95.    Defendants utilized third-party applications, such as patient-communication platforms, to store and/or access sensitive data, without adequate security measures in place to ensure that such platforms were not subject to cyberattack.

96.    Defendants failed to adequately monitor network traffic or suspicious network activity as necessary to prevent or promptly discovery malicious activity, and failed to implement appropriate network "traffic" controls to prevent the exfiltration of large amounts of data.  Defendants also failed to use appropriate anti-malware software and firewalls to detect suspicious network activity and failed to appropriately train staff to detect suspicious activity and avoid or mitigate the risk of malicious activity on the network.

### The Impact of the Cyberattacks on Class Plaintiffs

#### Jane Doe 1

97.    Jane Doe 1 saw Dr. Schwartz for three medically necessary lipedema surgeries between 2021 and 2022, which took place in California.  Through the course

of this treatment, Defendants obtained, generated, and maintained extensive Personal and Medical Information about Jane Doe 1, including her name, address, date of birth, phone number, insurance information, and copies of her driver's licenses and insurance card. In addition, Dr. Schwartz obtained and stored private images of Jane Doe 1 in a nude or semi-clothed state for purposes of medical treatment, including images that show Jane Doe 1's face as well as her lipedema. In addition, Dr. Schwartz obtained and maintained in his electronic files fully nude videos of Jane Doe 1.

98.    Jane Doe 1 is informed and believes that all or substantially all of her private data in Defendants' possession was compromised and exfiltrated through the Data Breaches. She faces an imminent risk of dissemination and/or misuse of her confidential data, including sensitive images.

99.    Dr. Schwartz failed to inform Jane Doe 1 of the First Hack in any manner although, on information and belief, her confidential Personal and Medical Information was compromised.  In or about January of 2025, Jane Doe 1 found out about the Second Hack through a social media group for women suffering from lipedema.  At that time, she also learned of the First Hack. She subsequently received a copy of the Data Breach Notice from Dr. Schwartz relating to the Second Hack on or about February 1, 2025.

100.    Jane Doe 1 has suffered severe emotional distress as a result of the data breaches. She lives in constant fear that malicious actors will either disclose her data publicly on the Hacker Website or elsewhere, or will use that data for nefarious purposes, including identity theft.  Jane Doe 1 has suffered fear, embarrassment, humiliation, shame, anxiety, and depression as a result of her private data and photographs being compromised. She has begun to suffer headaches, nausea and vomiting, and fatigue, as well as difficult concentrating. She is afraid of going out in public and being recognized from the images taken from Dr. Schwartz's system, and fears opening her email and other forms of electronic communication to discover that she has been contacted by the hackers.  The emotional and physical symptoms caused

1   by the Data Breaches have affected her ability to perform basic life activities.

2             **Jane Doe 2**

3       101.   Jane Doe 2 saw Dr. Schwartz for five medically necessary surgeries for

4 treatment of lipedema between 2022 and 2023, which took place in California.

5 Through the course of treatment, Defendants obtained, generated, and maintained

6 extensive Personal and Medical Information about Jane Doe 2, including her name,

7 address, date of birth, phone number, insurance information, payment information,

8 and copies of her driver's licenses and insurance card. In addition, Dr. Schwartz

9 obtained and stored private images of Jane Doe 2 in a nude or semi-clothed state for

10 purposes of medical treatment, including images that show Jane Doe 2's face as well

11 as her lipedema.

12       102.   Jane Doe 2 is informed and believes that all or substantially all of her

13 private information in Defendants' possession was accessed and exfiltrated during the

14 data breach.  She faces an imminent risk of dissemination and/or misuse of her

15 confidential data.

16       103.   In or about January of 2025, Jane Doe 2 learned about the Second Hack

17 through an online group for women suffering from lipedema.  Through this group she

18 learned that there was a public website with information and photographs of Dr.

19 Schwartz's patients, and that more patient information was being released in

20 alphabetical order.  Jane Doe 2 subsequently received a Data Breach Notice dated

21 January 15, 2025 from Dr. Schwartz.

22       104.   To mitigate the risk of identity theft, Jane Doe 2 signed up for an online

23 identity protection service for which she is personally paying.

24       105.   She has also suffered severe emotional distress as a result of the data

25 breach, including fear, humiliation, anxiety, and a sense of impending doom. She has

26 begun suffering nausea and headaches after learning of the data breach and has

27 difficulty sleeping.  In the weeks after she learned about the data breach, it was all

28 Jane Doe 2 thought about, and she had difficulty concentrating on anything else. She

fears going out in public and being recognized, and fears opening her emails and electronic communications.

### Jane Doe 3

106.    Jane Doe 3 had five surgeries with Dr. Schwartz between 2020 and 2021, which took place in California.  Through the course of this treatment, Defendants obtained, generated, and maintained extensive Personal and Medical Information about Jane Doe 3, including her name, address, date of birth, phone number, insurance information, personal payment information, and copies of her driver's licenses and insurance card. In addition, Dr. Schwartz obtained and stored private images of Jane Doe 3 in a semi-clothed and topless state for purposes of medical treatment, including images with Jane Doe 3's face visible.

107.    Jane Doe 3 is informed and believes that all or substantially all of the Personal and Medical Information in Defendants' possession was accessed and exfiltrated during the data breach. She faces an imminent risk of dissemination and/or misuse of her confidential data.

108.    She learned of the Second Hack in or about January of 2025 through a Facebook group for women suffering from lipedema.  After learning of the Second Hack through this group, she began researching online and found out about the First Hack.  Dr. Schwartz never informed her of the First Hack.  Through her online research, she also found the Hacker Website where other patients' photos and data had been posted as a result of the data breach.  Dr. Schwartz sent Jane Doe 3 a Data Breach Notice in January of 2025.

109.    Jane Doe 3 has spent many hours attempting to mitigate the harm caused by the Data Breaches, including researching the Data Breaches online, researching ways to protect her identity, and communicating with other victims about strategies to protect her private data from disclosure. She has been notified three times since the First Hack that her name now appears on the dark web.

110.    Jane Doe 3 constantly worries about the misuse of her information as a

result of the data breach, such as someone googling her name and finding semi-clothed or topless images of her online, or someone stealing her identity.  Her anxiety over the data breach has distracted her from other life activities, such as engaging with loved ones, and resulted in difficulty concentrating on other things.  She suffers fear, embarrassment, humiliation, depression, and a sense of impending doom as a result of the data breach, as well as nausea, headaches, fatigue, and insomnia.  The incident has caused Jane Doe 3 to be distrustful of doctors and other medical professionals and has caused concern about seeking other medical treatment.  Jane Doe 3 fears being recognized from the topless photographs exfiltrated from Dr. Schwartz's system.

**Jane Doe 4**

111.    Jane Doe 4 began seeing Dr. Schwartz in 2020 and had a surgery at his California office in July of 2024. Throughout her consultations with him, Dr. Schwartz's staff took unclothed photographs of her.

112.    In the interim, Dr. Schwartz's system was compromised. Without informing Jane Doe 4 of the Data Breaches, Dr. Schwartz continued to obtain confidential medical information, including her medical history, contact information, driver's license, medical insurance card, diagnoses, and list of medications. He also received, took, and maintained sensitive photographs of Jane Doe 4, reflecting her lipedema, including photographs with her face visible. All of this private Personal and Medical Information was stored on Dr. Schwartz's computer network.

113.    Dr. Schwartz performed surgery on Jane Doe 4 at his Beverly Hills, California office in July of 2024 mere weeks after he purportedly found out that he had been hacked for a second time. Despite admitting knowledge of the Second Hack at the time, Dr Schwartz did not notify Jane Doe 4 of the breach, nor, that her private data was compromised. Instead, he proceeded to have his staff take photographs and video of Jane Doe 4 during PreOp, PostOp, and on the operating table during surgery.

114.    On information and belief, the hackers compromised and downloaded all of Jane Doe 4's data in Dr. Schwartz's possession.  Jane Doe 4 faces an imminent

threat of misuse and/or public release of her Personal and Medical Information.

115.   Jane Doe 4 has spent numerous days attempting to mitigate her damage, including researching the Data Breaches and potential mitigation strategies, contacting Dr. Schwartz, contacting law enforcement, and coordinating with other victims.

116.   The Data Breaches have caused severe emotional distress to Jane Doe 4, and she is currently in therapy for the emotional harm caused by Defendants' conduct. Jane Doe 4 has a pre-existing medical condition that causes occasional panic attacks, which have become more frequent and affected her quality of life.  After she learned of the Data Breaches, she has lived in constant fear, anxiety, and depression, and has been required to take prescription medication to help control the emotional impact. She is unable to sleep, and her insomnia has not responded to medication.  She feels fear, humiliation, embarrassment, shame, and a sense of impending doom.  The emotional distress has manifested in physical symptoms, including insomnia, nausea, and fatigue.  Jane Doe 4 fears opening her emails and electronic communications and being contacted by the hackers and has received a series of strange phone calls and texts since the Second Hack.  The Data Breaches have consumed Jane Doe 4's thoughts, making it impossible for her to concentrate on other activities, and have severely impacted her daily life.

**Jane Doe 5**

117.   Jane Doe 5 saw Dr. Schwartz for three medically necessary lipedema surgeries and a follow-up procedure between 2022 and 2023.  Dr. Schwartz performed the surgeries and the procedure in his office in Beverly Hills, California. Jane Doe 5 continued her consultation with Dr. Schwartz and his staff thereafter. At all relevant times, Dr. Schwartz and his staff were in California.

118.   Through the course of her treatment, Defendants obtained, generated, and maintained significant amounts of Personal and Medical Information regarding Jane Doe 5.  This information included, without limitation, Jane Doe 5's personal identifying information, her insurance information, and her medical history,

conditions, and diagnoses. It also included a large number of nude and partially clothed photographs documenting Jane Doe 5's condition and the progress of her treatment.

119.  On information and belief, during the Data Breaches, hackers gained access to and exfiltrated Jane Doe 5's confidential information.  Jane Doe 5 faces a risk of imminent release of her personally identifying and private medical information as a result of the Data Breaches.

120.  Jane Doe 5's son discovered articles about the First Hack online.  In early 2024, Jane Doe 5 contacted Dr. Schwartz to inquire about the data breach and whether her medical information was compromised.  Thereafter, a person claiming to be in charge of cybersecurity for Dr. Schwartz called Jane Doe 5. Jane Doe 5 is informed and believes that the person was Dr. Schwartz's brother.

121.  The individual claimed (falsely) that the data breach had affected only approximately six patient files and that Defendants had stopped the hackers before they gained significant access to Defendants' network. He further claimed that Dr. Schwartz was working with the FBI and had completely overhauled the computer system to prevent future cyberattacks. The individual also assured Jane Doe 5 that her information was safe and had not been compromised.  On information and belief, these representations were false and intended to dissuade Jane Doe 5 from taking action in response to the security breach.

122.  In or about December of 2024, Jane Doe 5 learned of the Second Hack through a post to an online forum.  She attempted to contact Dr. Schwartz, but he was not returning phone calls.  She received no further communication from Dr. Schwartz until receiving a generic Data Breach Notice in or about January of 2025.

123.  Jane Doe 5 has suffered severe emotional distress as a result of the Data Breaches, including fear, embarrassment, humiliation, a sense of impending doom, anxiety, and depression not only due to the violation of her medical privacy but also the violation of the trust she placed in Dr. Schwartz.  As a consequence of the Data

Breaches, Jane Doe 5 has difficulty concentrating and fears opening her emails and other electronic communications, which has affected her ability to engage in ordinary daily activities.

**Jane Doe 6**

124.    Jane Doe 6 underwent two medically necessary surgeries by Dr. Schwartz in 2021 to treat lipedema. During the course of treatment, Defendants obtained Jane Doe 6's private information, including her personally identifying information, insurance information, and medical information. They also obtained photographs and videos of Jane Doe 6 both before and during surgery.  All of Jane Doe 6's medical data was stored on Defendants' network.

125.    Jane Doe 6 is informed and believes that all or substantially all of her medical information, photographs, and videos were accessed and exfiltrated during the Data Breaches. Jane Doe 6 faces a risk of imminent release of her personally identifying and private medical information as a result of the Data Breaches.

126.    Jane Doe 6 first learned of the Data Breaches in late December 2024 or early January 2025 through other victims.  In or about January of 2025, Jane Doe 6 received the generic Data Breach Notice from Dr. Schwartz.

127.    Jane Doe 6 has suffered severe emotional distress as a result of the Data Breaches.  She remains concerned that her personal, medical, and financial information has been or may be misused.

**Jane Doe 7**

128.    Jane Doe 7 underwent two medically necessary surgeries with Dr. Schwarts to treat her lipedema.  The surgeries occurred at Dr. Schwartz's office in Beverly Hills, California. In the course of treatment, Dr. Schwartz obtained detailed Personal and Medical Information concerning Jane Doe 7, including, without limitation, identifying information (including a copy of her driver's license), payment information, medical information and diagnoses, and photographs and videos of Jane Doe 7 in a nude or partially clothed state, including photos and videos taken by Dr.

Schwartz's staff during surgery.

129.   All of this Personal and Medical information was stored on Dr. Schwartz's computer network.  On information and believe, all of the information was compromised during the Data Breaches.  As a result, Jane Doe 7 faces an imminent risk that her data will be misused and/or leaked on the internet.

130.   Jane Doe 7 learned of the Data Breaches only after the Second Hack. Dr. Schwartz failed to notify her of the First Hack.  In or about December of 2024, another patient of Dr. Schwartz contacted Jane Doe 7 to notify her of the Second Hack. She informed Jane Doe 7 that she had been directly contacted by hackers via text, phone call, and email, and that there was a public website disclosing patient information and photos. Thereafter, Jane Doe 7 received a copy of the generic Data Breach Notice from Dr. Schwartz.

131.   Jane Doe 7 has been severely affected by the Data Breaches. She is prominent in the lipedema community and has gone to great lengths to protect her identity and her social media accounts.  She has been constantly subject to unwanted attention and contact from third parties as a result of her outreach to those living with lipedema.  She now lives in fear that her identifying and medical information will be disclosed in a public manner or otherwise misused.  Due to the data breaches, she has suffered fear, embarrassment, and fear of opening email and electronic communications. She has spent countless hours attempting to mitigate the damage caused by the Data Breaches, including conducting online research into the Data Breaches, researching mitigation strategies such as identity protection and credit protection, and coordinating with other victims.

**Jane Doe 8**

132.   Jane Doe 8 saw Dr. Schwartz for five medically necessary surgeries to treat her lipedema and for skin excisions.  She is active online in the lipedema community.

133.   During the course of treatment, Dr. Schwartz and his staff obtained a

large volume of Personal and Medical Information regarding Jane Doe 8. Among other things, Defendants obtained Jane Doe 8's identifying information, insurance information, and medical information, including conditions, diagnoses and treatments. Defendants also obtained and generated photographs of Jane Doe 8 in a nude and/or partially clothed state during the course of treatment.

134.   On information and belief, all of Jane Doe 8's Personal and Medical Information was stored on Defendants' computer network. As a result, all of that information was compromised in the Data Breaches. Jane Doe 8 faces an imminent risk that her private information will be misused or publicly disclosed.

135.   Jane Doe 8 has been severely affected by the Data Breaches. She operates an online business and fears that if her private medical information is disclosed, it will damage her business prospects. She has also suffered shame, embarrassment, and humiliation as a result of the Data Breaches.

### *Plaintiffs and Class Members Suffer Damages*

136.   Defendants negligently, and unlawfully, (i) failed to reasonably secure their patients' information, allowing malicious actors to access, copy, publish and disseminate extremely sensitive patient information; (ii) failed to adequately notify their patients of the breach (but rather mislead them); (iii) failed to mitigate the harm by refusing to take reasonable steps to contain the further dissemination of the highly sensitive information; and (iv) failed to prevent a further intrusion into Defendants' computer systems, thus (v) ultimately allowing it to happen all over again. Notwithstanding that Defendants were on notice of the exact risks realized, they failed to secure his patients' data.  This is egregious conduct evincing a willful disregard of Plaintiffs' and Class Members' rights and safety.

137.   The Data Breaches resulted from Defendants' inadequate cybersecurity and affirmative acts, which exposed Class Plaintiffs' and Class Members' confidential information to unauthorized cybercriminals who exfiltrated it. To date, Defendants have not disclosed the full details of the Data Breaches nor the findings of any

investigations.

138.   The Data Breaches were directly caused by Defendants' failure to employ reasonable cybersecurity measures and protocols to protect patients' information. Specifically, Defendants stored confidential data on a network left vulnerable to infiltration, thus permitting the hacking to succeed. Moreover, Defendants stored extremely sensitive patient data – *i.e.*, nude and during-surgery photographs – on inadequately secured portions of their network accessible via the internet. Defendants were aware of the known, prevalent threat of cyberattacks, recognizing that lacking security measures would leave Class Plaintiffs' and Class Members' information in jeopardy.

139.   The consequences of Defendants' brazen failure to protect patients' confidential data are severe and enduring. Once stolen, such data can be misused for years. According to the Department of Justice, victims of data breaches are statistically more likely to experience identity fraud.

140.   Both federal and state law generally prohibit healthcare providers from disclosing patients' confidential medical information without prior authorization.

141.   Beyond statutory obligations, Defendants owed Plaintiffs and Class Members a common law duty to protect their confidential information by exercising reasonable care in obtaining, securing, safeguarding, deleting, and protecting it from unauthorized access, misuse, or disclosure.

142.   As a direct result of Defendants' reckless and negligent conduct, unauthorized parties accessed, acquired, and misused Class Plaintiffs' and Class Members' confidential information, invading their privacy, exposing them to an increased risk of identity theft, public disclosure, and fraud.

143.   Identity theft has serious consequences. While some victims resolve issues quickly, others spend significant time and money repairing damage to their credit, financial standing, and personal reputation. Some victims may lose job opportunities, be denied loans, or even face wrongful criminal charges due to

1    fraudulent use of their identities.

2    144.    Other potential consequences include fraudulent loans, unauthorized

3    medical services billed under victims' names, tax fraud, and credit card fraud. In this

4    case, the potential consequences, which were known and foreseeable to Dr. Schwartz,

5    including public disclosure of patients private medical information and images.

6    145.    Class Plaintiffs' and Class Members' confidential information has

7    inherent value. Due to the breach, its value has diminished, while Defendants unjustly

8    benefitted from failing to disclose their inadequate security measures.

9    146.    Defendants had ample resources to prevent the breach but deliberately

10    failed to implement adequate security measures, despite their legal obligations to

11    protect patient data.  Had Defendants implemented industry-recommended security

12    measures, the breach and subsequent theft of Class Plaintiffs' and Class Members'

13    confidential information could have been prevented.

14    147.    Stolen confidential information can be exploited alone or combined with

15    other publicly available data to commit additional fraud and wrongdoing. Hackers use

16    such data for spear-phishing schemes, impersonating legitimate institutions to deceive

17    victims into revealing even more sensitive information.

18    148.    Additionally, the stolen information includes highly sensitive and

19    humiliating videos and photographs of Class Plaintiffs and Class Members nude,

20    partially clothed, under anesthesia, and undergoing surgery.  The release and

21    threatened release of this data has caused and will continue to cause severe emotional

22    distress to Class Plaintiffs and Class Members, compounding the harm.

23    149.    Due to Defendants' wrongful actions and omissions, Plaintiffs and Class

24    Members face ongoing risks, including:

25                    a.    The incessant threat of dissemination of private information

26                          including PII, medical diagnosis, extremely sensitive videos and

27                          images.

28                    b.    Fraudulent use of their confidential information;

c.    Financial losses from identity theft;

d.    Emotional distress and anxiety;

e.    Future costs related to fraud prevention and monitoring.

150.    Class Plaintiffs and Class Members have an undeniable interest in ensuring their confidential information remains secure and is not subject to further unauthorized access or misuse.

151.    Defendants disregarded Class Plaintiffs' and Class Members' rights by willfully, recklessly, or negligently failing to protect their data systems; failing to disclose their inadequate computer systems and security practices; failing to take reasonable steps to prevent the Data Breaches; failing to monitor and detect the Data Breaches promptly; and failing to provide accurate and timely notice regarding the Data Breaches.

152.    Because Defendants did not implement or adhere to reasonable data security protocols, Class Plaintiffs' and Class Members' PII and PHI was obtained by bad actors. Plaintiffs and Class Members have sustained or face a substantial risk of identity theft and fraud, forcing them to invest significant time and money to safeguard against further harm. They remain indefinitely vulnerable to heightened risk of identity theft and fraud.

153.    Additionally, this is class is mainly comprised of vulnerable women particularly suspectable to humiliation on the basis of their appearance.  Many victims here suffer from a disfiguring disease and have endured a lifetime of stares, glares, taunts and hurtful comments.  Particularly distressing is the fact that nude photos and videos of class members' bodies (including some while under anesthesia) linked with their names, faces, and other personally identifying information, have been published not only on the dark web, but also on the public internet.

## CLASS ACTION ALLEGATIONS

154.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated persons in

the following class:

> All persons residing in the United States whose personal and medical
>
> information was compromised as a result of the Data Breaches (the "Class").

The Class excludes (a) Defendants and their relatives, employees, agents, attorneys, insurers, and representatives; (b) the Court and its staff; and (c) any persons who give notice that they wish to be excluded from the class pursuant to procedures to be specified by the Court.

155. Plaintiffs reserve the right to amend this Class and to add subclasses.

156. The Court should permit this action to be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, because each of the requirements for class treatment is satisfied.

157. **Numerosity:** The Class is so numerous that the individual joinder of all members is impracticable. Plaintiffs are informed and believe that there are many hundreds if not thousands of total class members, and the class members are geographically dispersed.

158. **Typicality.** Class Plaintiffs' claims are typical of those of other class members. Each of the Class Plaintiffs had their sensitive personal and medical information accessed and exfiltrated during the cybersecurity attacks described above.

159. **Commonality.** The claims of class members raise many common legal and factual issues, which predominate over any individualized issues, including, without limitation, the following:

> a. Whether Class Members Personal and Medical Information stored on Defendants' system constituted protected personal identifying information and/or protected health information under state and federal law;
>
> b. Whether Defendants acted negligently in connection with the monitoring and/or protecting of Class Plaintiffs' and Class Members' Personal and Medical Information
>
> c. Whether and when Defendants actually learned of the First Hack

and Second Hack and whether their response was adequate under law;

d.      Whether Defendants were required under California and/or federal law to promptly notify affected patients of the data breaches;

e.      Whether Defendants did promptly notify patients of the Data Breaches;

f.      Whether Defendants owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their Confidential Information;

g.      Whether Defendants breached that duty;

h.       Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the risk of storing Plaintiffs' and Class members' Confidential Information;

i.      Whether Defendants knew or should have known that they did not employ reasonable measures to keep Plaintiffs' and Class members' PII/PHI secure and prevent loss or misuse of that Confidential Information

j.      Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breaches to occur;

k.      Whether Defendants caused Class Plaintiffs and Class Members damages through their negligent conduct and violation of statute;

l.      Whether Defendants violated the California Unfair Competition Law (Business & Professions Code § 17200, et seq.); and

m.      Whether Defendants violated the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, et seq.).

n.      Whether Class members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

160.    **Adequacy**: Class Plaintiffs are adequate representatives of the Class. Class Plaintiffs are aware of their fiduciary obligations to Class Members, will fairly and adequately protect those interests, and have no disabling conflicts that would be

antagonistic to those of Class Members. Class Plaintiffs have retained competent counsel, experienced in consumer class actions and other complex litigation.

161. **Superiority and Manageability**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein in view of the large number of victims. It will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

162. The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged. Absent class proceedings, Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative.

163. Defendants are located and headquartered in California, are licensed as a physician in California, all plaintiffs were treated in California, on information and belief, all managerial decisions are made in California, and all the omissions and affirmative acts complained of herein occurred within California. Thus, application of California law is appropriate.

164. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant

1  manageability problems with prosecuting this lawsuit as a class action.

2      165.    Adequate notice can be given to Class members directly using

3  information maintained in Defendants' records.

4      166.    Unless a Class-wide injunction is issued, Plaintiffs and Class members

5  remain at risk that Defendants will continue to fail to properly secure their

6  confidential information, resulting in another data breach, continue to refuse to

7  provide proper notification to Class Members regarding the Data Breach, and continue

8  to act unlawfully as set forth in this Complaint.

9      167.    Defendants have acted or refused to act on grounds generally applicable

10 to the Class and, accordingly, final injunctive or corresponding declaratory relief with

11 regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the

12 Federal Rules of Civil Procedure.

**FIRST CLAIM**

**VIOLATION OF THE CMIA**

**[Cal. Civ. Code § 56, *et seq.*]**

**(On Behalf of Plaintiffs and the Class)**

17     168.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully

18 set forth herein.

19     169.    At all relevant times, Defendants were providers of healthcare within the

20 meaning of California Civil Code § 56.06(a) and maintain medical information as

21 defined by California Civil Code § 56.05.

22     170.    Plaintiffs and Class Members are patients of Defendants, as defined in

23 California Civil Code § 56.05(k).

24     171.    Plaintiffs and Class Members provided their personal medical

25 information to Defendants.

26     172.    At all relevant times, Defendants collected, stored, managed, and

27 transmitted Plaintiffs' and Class Members' personal medical information.

28     173.    As a provider of health care, Defendants are required by the CMIA to

ensure that medical information regarding patients is not disclosed, disseminated, or released without patients' authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under California Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

174.   As a provider of health care, Defendants are required by the CMIA not to disclose medical information regarding a patient without first obtaining an authorization under California Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, and 56.104.

175.   As a provider of health care, Defendants are required by the CMIA to create, maintain, preserve, and store medical records in a manner that preserves the confidentiality of the information contained therein under California Civil Code §§ 56.06 and 56.101(a).

176.   As a provider of health care, Defendants are required by the CMIA to protect and preserve confidentiality of electronic medical information of Plaintiffs and the Class in its possession under California Civil Code §§ 56.06 and 56.101(b)(1)(A).

177.   As a provider of healthcare, Defendants are required by the CMIA to take appropriate preventive actions to protect confidential information or records against release consistent with Defendants' obligations under California Civil Code § 56.36(2)(E).

178.   As a result of the Data Breaches, Defendants have misused, disclosed, and/or allowed third parties to access, misuse, disclose, and view Plaintiffs' and Class Members' personal medical information without their written authorization compliant with the provisions of CMIA.

179.   The bad actors who committed the Data Breaches obtained Plaintiffs' and Class members' personal medical information, viewed it, and now have it available to sell or otherwise disclose to other bad actors for further misuse.  They have already disclosed certain of that data both on the dark web and publicly.

180.   Defendants' misuse and/or disclosure of medical information regarding

CLASS ACTION COMPLAINT

Plaintiffs and Class members constitutes a violation of California Civil Code §§ 56.10, 56.11, 56.13, and 56.26.

181.   As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care, Plaintiffs' and Class Members' personal medical information was disclosed without written authorization.

182.   By disclosing Plaintiffs' and Class Members' confidential information without their written authorization, Defendants violated California Civil Code § 56, *et seq*., and their legal duty to protect the confidentiality of such information.

183.   Defendants also violated Sections 56.06 and 56.101 of the California Civil Code, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction, or disposal of confidential personal medical information.

184.   As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care that caused the Data Breach, Plaintiffs' and Class members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs' and Class members' written authorization.

185.   Defendants' negligent and reckless failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs' and Class members' medical information in a manner that preserved the confidentiality of the information violated the CMIA, Cal. Civ. Code §§ 56.06 and 56.101(a). Accordingly, Defendants' systems and protocols did not protect and preserve the integrity of electronic medical information in violation of the CMIA, Cal. Civ. Code § 56.101.

186.   As a direct and proximate result of Defendants' and/or their employees' above-described conduct in violation of the CMIA, Plaintiffs and Class Members were injured and have suffered damages, as described above, from Defendants' illegal disclosure and/or negligent release of their medical information in violation of California Civil Code §§ 56.10 and 56.101.

187.   Plaintiffs and Class members are therefore entitled to statutory damages of one thousand dollars ($1,000) for each violation under California Civil Code §

56.36(b)(1); the amount of actual damages, if any, for each violation under California Civil Code § 56.36(b)(2); injunctive relief; and attorneys' fees, expenses, and costs.

## SECOND CLAIM

### NEGLIGENCE

### (On Behalf of Plaintiffs and the Class)

188.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

***Negligence***

189.   As a condition of receiving services, Plaintiffs and Class Members were obligated to provide Defendants directly, or through affiliates, with their confidential information.

190.   Plaintiffs and Class Members entrusted their confidential information to Defendants with the understanding that Defendants would safeguard their information.

191.   Defendants had full knowledge of the sensitivity of the confidential information and the types of harm that Plaintiffs and Class Members could and would suffer if the confidential information were wrongfully disclosed.

192.   Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, implementing, and testing security protocols to ensure that confidential information in their possession was adequately secured and protected, and that employees and vendors tasked with maintaining such information were adequately trained on relevant cybersecurity measures.

193.   Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the confidential medical information of Plaintiffs and Class Members, the critical importance of providing adequate security for that information, the ongoing cyber threats and malicious actions

being perpetrated against others in the medical field, and that their training, education, and IT security protocols were insufficient to secure the confidential information of Plaintiffs and Class Members.

194.    Defendants' own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' misconduct included, but was not limited to, failing to take reasonably necessary steps to prevent the Data Breaches as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and authorized disclosure of patient confidential information of Plaintiffs and Class Members.

195.    Plaintiffs and Class Members had no ability to protect their Confidential Information that was in Defendants' possession.

196.    Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

197.    Defendants have at least partially admitted that Plaintiffs' and Class members' confidential information was wrongfully disclosed to unauthorized third persons as a result of the Data Breaches.

198.    Through their actions and omissions, Defendants unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' confidential information while it was within Defendants' possession or control.

199.    Defendants improperly and inadequately safeguarded Plaintiffs' and Class Members' confidential information in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

200.    Through their actions and omissions, Defendants unlawfully breached their duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' confidential information.

201.    Through their actions and omissions, Defendants unlawfully breached

their duty to adequately disclose to Plaintiffs and Class members the existence and scope of the Data Breaches.

202.    Through their actions and omissions, Defendants failed to take reasonable steps to mitigate harm caused by their negligence including attempting to contain the further dissemination of private information.

203.    But for Defendants' negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' confidential information would not have been compromised and/or misused by unauthorized third parties to engage in fraudulent activity and public disclosure that further harmed Plaintiffs and Class Members.

204.    There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the confidential information and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and the Class.

205.    As a result of Defendants' negligence, unauthorized parties acquired Plaintiffs' and Class Members confidential information and used that information to harm Plaintiffs and Class Members as described above.

206.    As a further result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer damages and injury including, but not limited to:

a.    Severe emotional distress due to humiliation, shock, worry and anxiety over the incessant threat of publication, and actual publication, of confidential information including humiliating photos and videos of nude bodies and a sensitive medical procedure along with identifying information, as well as identity theft;

b.    actual identity theft;

c.    an increased risk of identity theft, fraud, and/or misuse of their confidential information;

d.    the loss of control over how their confidential information is used;

e.    the compromise, publication, and/or theft of their information;

f.     out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their confidential information, and the value of their time in seeking to mitigate damages;

g.     diminished value of the confidential information;

h.     lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breaches, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from data breaches and identity theft;

i.     the continued risk to their confidential information, which remains in Defendants' possession and is subject to further unauthorized disclosures as long as Defendants fail to undertake appropriate and adequate measures to protect confidential information in their continued possession; and

j.     future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the confidential information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

### *Negligence Per Se*

207.   Violations of statutes that establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence per se.

208.   Section 5 of the FTC Act prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect confidential information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

209.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class members' confidential

information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of confidential information they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

210. Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

211. Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

212. The harm that occurred as a result of the Data Breaches is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

213. Defendants' violation of HIPAA also independently constitutes negligence per se.

214. HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and setting forth the conditions under which such information can be used, and to whom it can be disclosed. These privacy laws apply not only to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient, where exposure of such information could present a risk of harm to the patient's finances or reputation.

215. Plaintiffs and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

216. The harm that occurred as a result of the Data Breaches is the type of harm HIPAA privacy laws were intended to guard against.

217. As a direct and proximate result of Defendants' negligence per se,

Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to, an increased risk of identity theft, fraud, and/or misuse of their confidential information, damages from lost time and effort to mitigate the actual and potential impact of the Data Breaches on their lives, *e.g.*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, and filing police reports. Plaintiffs and Class Members have also suffered severe emotional distress as alleged above.

218.   Plaintiffs and Class members have also suffered damages, which may take months if not years to discover and detect.

219.   Defendants' conduct, as alleged herein, was willful, fraudulent, and malicious. Defendants deliberately disregarded the need to safeguard Plaintiffs' and Class Members' confidential information and were willfully indifferent to the risk to Plaintiffs and Class Members of wrongful access to and disclosure of their confidential information.  In addition, Defendants misled Plaintiffs and Class Members as to the facts surrounding the Data Breaches, including the nature and scope of the breaches, and the reasons the breaches occurred.

## THIRD CLAIM

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

## CAL. BUS. & PROF. CODE §§ 17200, ET SEQ. ("UCL")

### (On Behalf of Plaintiffs and the Class)

220.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

221.   The California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

222.   By reason of Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breaches, and the unauthorized disclosure of Plaintiffs and Class Members' confidential information, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

223.   Defendants' business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the confidential information of Plaintiffs and Class members has been compromised for unauthorized parties to see, use, and otherwise exploit.

224.   In the course of conducting their business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class Members' PII/PHI, and by violating the statutory and common law alleged herein, including, inter alia, California's CMIA (Civ. Code §§ 56.10(a), (e); 56.101(a), 56.101(b)(1)(A); 56.36), the California Consumer Privacy Act of 2018 ("CCPA") (Cal. Civ. Code § 1798.150(a)(1)), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1302d; 45 C.F.R. §§ 164.306(a), (d), (e); 164.308(a); 164.312(a), (d), (e); 164.316(a), (b)), California Civil Code § 1798.81.5, and Article I, Section 1 of the California Constitution (constitutional right to privacy).

225.   Defendants also violated the UCL by failing to adequately and timely notify Plaintiffs and Class members pursuant to California Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their PII/PHI. Had Plaintiffs and Class Members been adequately and timely notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI and identities.

226.   Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs'

and Class Members' confidential information also constitute "unfair" business acts and practices within the meaning of the UCL in that Defendants' conduct was substantially injurious to Plaintiffs and Class Members, offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and the gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct. Said acts, omissions and inaction violated strong public policies embodied in the California Constitution, the CMIA, the CCPA, and HIPAA.

227.  In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breaches in a timely and accurate manner, contrary to the duties imposed by Cal. Health & Safety Code § 1280.15(b)(2).

228.  Plaintiffs and Class members suffered (and continue to suffer) injury in fact, invasion of privacy, and lost money or property as a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions including, inter alia, the unauthorized release and disclosure of their confidential information. This paying for a certain level of security for their PII/PHI but receiving a lower level and paying more for Defendants' products and services than they otherwise would have paid had they known Defendants were not providing the reasonable security represented in Defendants' stated privacy policies and as required by law. Defendants' security practices have economic value in that reasonable security practices reduce the risk of theft of PII/PHI collected, maintained, and stored by Defendants.

229.  Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' confidential information and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class members.

230.  Plaintiffs seek prospective injunctive relief, including improvements to Defendants' data security systems and practices, in order to ensure that such security

is reasonably sufficient to safeguard patients' private information that remains in Defendants' custody.

231.   Unless such class-wide injunctive relief is issued, Defendants will continue to engage in the above-described wrongful conduct, more data breaches will occur, Plaintiffs and Class Members will remain at risk, and there is no other adequate remedy at law that would ensure Plaintiffs (and other consumers) can rely on Defendants' representations regarding data security in the future.

232.   Furthermore, in the alternative to legal remedies sought herein Plaintiffs and the class further seek  restitution of money or property that Defendants have acquired by means of Defendants' unlawful and unfair business practices; restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices; declaratory relief; attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5); and injunctive or other equitable relief.

## FOURTH CLAIM

### INVASION OF PRIVACY

### (On Behalf of Plaintiffs and the Class)

233.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

234.   California established the right to privacy in Article 1, Section 1 of the California Constitution.

235.   Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their confidential information and were entitled to protection of this information against disclosure to unauthorized third parties.

236.   Defendants owed a duty to patients, including Plaintiffs and Class Members, to keep their confidential information confidential.

237.   The unauthorized access to and release of confidential information, especially personal health information, photographs, and video, is highly offensive to

a reasonable person.

238.   The intrusion was into a place or thing, which was private and entitled to be private. Plaintiffs and Class members disclosed their confidential information to Defendants as part of their use of Defendants' medical services, with the intention and reasonable understanding that the confidential information would be kept confidential and protected from unauthorized access and disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

239.   The Data Breaches constitute an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

240.   Defendants acted with a knowing state of mind when they permitted the Data Breaches because they knew their information security practices were inadequate and would likely result in a data breach such as the one that harmed Plaintiffs and Class Members.

241.   Acting with knowledge, Defendants had notice that their inadequate cybersecurity practices would cause injury to Plaintiffs and Class Members.

242.   As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class Members' confidential information was disclosed to and used by third parties without authorization in the manner described above, causing Plaintiffs and Class Members to suffer damages.

243.   Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class members in that the confidential information maintained by Defendants can be viewed, distributed, and used by unauthorized persons.

244.   Plaintiffs and Class members have no adequate remedy at law for the injuries because a judgment for monetary damages will not end the invasion of

1  privacy for Plaintiffs and Class members.

2  **FIFTH CLAIM**

3  **VIOLATION OF CAL. CIV. CODE § 1798.80 ET SEQ.**

4  **(On Behalf of Plaintiffs and the Class)**

5  245.   Plaintiffs restate and reallege all of the foregoing paragraphs as if fully

6  set forth herein.

7  246.   Section 1798.2 of the California Civil Code requires any "person or

8  business that conducts business in California, and that owns or licenses computerized

9  data that includes personal information" to "disclose any breach of the security of the

10 system following discovery or notification of the breach in the security of the data to

11 any resident of California whose unencrypted personal information was, or is

12 reasonably believed to have been, acquired by an unauthorized person." Under section

13 1798.82, the disclosure "shall be made in the most expedient time possible and

14 without unreasonable delay ...."

15 247.   The CCRA further provides: "Any person or business that maintains

16 computerized data that includes personal information that the person or business does

17 not own shall notify the owner or licensee of the information of any breach of the

18 security of the data immediately following discovery, if the personal information was,

19 or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ.

20 Code § 1798.82(b).

21 248.   Any person or business that is required to issue a security breach

22 notification under the CCRA shall be written in plain language and contain the

23 following information:

24    a.    The name and contact information of the reporting person or

25 business subject to this section;

26    b.    A list of the types of personal information that were or are

27 reasonably believed to have been the subject of a breach;

28    c.    If the information is possible to determine at the time the notice is

CLASS ACTION COMPLAINT

provided, then any of the following:

         i.     The date of the breach;

        ii.     The estimated date of the breach; or

      iii.     The date range within which the breach occurred.

      iv.     The notification shall also include the date of the notice. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

      v.     A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

      vi.     The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

249. The Data Breaches described herein constituted a "breach of the security system" of Defendants.

250. As alleged above, Defendants unreasonably delayed informing Plaintiffs and Class Members about the Data Breaches, affecting their Personal and Medical Information, after Defendants knew the Data Breaches had occurred.

251. Defendants failed to disclose to Plaintiffs and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendants knew or reasonably believed such information had been compromised.

252. Defendants' ongoing business interests gave Defendants incentive to conceal the Data Breaches from the public to ensure continued revenue, which Defendants did for many months.

253. Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiffs and Class members would impede its investigation.

254.    As a result of Defendants' violation of California Civil Code § 1798.82, Plaintiffs and Class Members were deprived of prompt notice of the Data Breaches and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class Members because their stolen information would have had less value to identity thieves.

255.    As a result of Defendants' violation of California Civil Code § 1798.82, Plaintiffs and Class members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breaches itself.

256.    Plaintiffs and Class members seek all remedies available under California Civil Code § 1798.84, including, but not limited to, the damages suffered by Plaintiffs and Class members as alleged above and equitable relief.

257.    Because Defendants' violations were willful, intentional, and/or reckless, Plaintiffs seek civil penalties not to exceed $3,000 per violation or, in the alternative, $500 per violation pursuant to California Civil Code § 1798.84, as well as attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Class Plaintiffs, on behalf of themselves and all members of the Class, pray for relief as follows:

A.    An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that each of the named Plaintiffs is an appropriate representative of the certified Class;

B.    Injunctive relief requiring Defendants to (1) adopt, implement, and maintain reasonable data security systems that maintain personally identifying information to comply with the applicable law and industry standards; (2) engage third-party auditors and internal personnel to determine the scope of the Data Breaches and the patients whose records were compromised; (3) conduct security

testing and audits on Defendants' systems on a periodic basis to ensure compliance; (4) promptly correct any problems or issues detected by such audits and testing; (5) conduct period training to inform internal personnel how to prevent, identify and contain a breach, and how to appropriately respond; and (6) to provide accurate notice of the nature and scope of the Data Breaches, and the compromised data, to all affected patients.

C.      An award of credit monitoring and identity theft protection services to Plaintiffs and all members of the Class;

D.      Actual, compensatory, consequential, incidental, nominal, and statutory damages;

E.      Restitution and restitutionary disgorgement;

F.      Statutory damages and penalties, trebled, and/or punitive or exemplary damages, to the extent permitted by law, including, but not limited, to the following:

1.      Damages not to exceed three thousand dollars ($3,000) per violation, attorney's fees not to exceed one thousand dollars ($1,000) per violation, and the costs of litigation under California Civil Code § 56.35;

2.      Statutory damages of one thousand dollars ($1,000) for each violation under California Civil Code § 56.36(b)(1);

3.      Actual damages suffered, according to proof, for each violation under California Civil Code § 56.36(b)(2);

4.      Damages of $3,000 per violation of Civil Code section 1798.83 or, in the alternative, $500 per violation,  pursuant to Civil Code §§ 1798.84(b);

G.      Nominal damages according to proof;

H.      Attorney's fees pursuant to the common fund doctrine and as provided by law, including, without limitation, under California Civil Code §§ 56.35 and 1798.84, and California Code of Civil Procedure § 1021.5.

I.      An award of costs of suit as provided by law;

J.      Pre- and post-judgment interest as provided by law;

CLASS ACTION COMPLAINT

1    K.    Such other and further relief as the Court may deem just and proper.

2  Dated:  February 3, 2025                    Respectfully submitted,
                                              ROBINSON MARKEVITCH & PARKER LLP
3

4                                             By: /s/ Damion Robinson
                                                  Damion D. D. Robinson
5                                                 David Markevitch
                                                  Jimmie Davis Parker
6
                                              Attorneys for Class Plaintiffs and all
7                                             others similarly situated

8                          **DEMAND FOR JURY TRIAL**

9        Class Plaintiffs demand a trial by jury on all matters so triable.

10
    Dated:  February 3, 2025                    Respectfully submitted,
11                                            ROBINSON MARKEVITCH & PARKER LLP

12                                            By: /s/ Damion Robinson
                                                  Damion D. D. Robinson
13                                                David Markevitch
                                                  Jimmie Davis Parker
14
                                              Attorneys for Class Plaintiffs and all
15                                            others similarly situated

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT